547 P.2d 1104

SUN CITY WATER COMPANY, an Arizona Corporation, Appellant,

v.

The ARIZONA CORPORATION COMMISSION, Appellee.

No. 1 CA–CIV 2934.

Court of Appeals of Arizona,
Division 1,
Department B.

April 6, 1976.
Rehearing Denied May 19, 1976.

Evans, Kitchel & Jenckes, P. C. by Earl H. Carroll, Phoenix, for appellant.

Robertson, Molloy, Fickett & Jones, P. C. by Charles D. Wahl, Michael J. Meehan, Tucson, for appellee.

## OPINION

JACOBSON, Presiding Judge.

This appeal calls into question the manner in which the Arizona Corporation Commission may set a "fair rate of re-

turn" on the fair base value of a public service corporation's assets.

The appellant, Sun City Water Co. (Company) appeals from a judgment of the Superior Court of Maricopa County affirming a decision of appellee, Arizona Corporation Commission (Commission) setting the fair rate of return on Sun City's fair base value at 6.72%. The trial court, however, remanded the matter back to the Commission for further hearings on the issue of whether the rate schedule adopted by the Commission would yield a full 6.72% return. Only Sun City has appealed.

The Company is a wholly-owned subsidiary of Citizen's Utilities Company, supplying water to residents of the Sun City area of Maricopa County. On October 13, 1972, the Company filed an application with the Commission, requesting that it determine the fair value of the Company's utility properties, that it fix a just and reasonable rate of return thereon and that it approve rate schedules which would provide the rate of return that was determined. At this time the Company did not propose rate schedules (actual charges for water supplied to customers) as it was unaware of what revenue requirements the Commission would determine were necessary.

The hearings on this application were concluded on May 10, 1973, but the Commission did not issue its rate order until October 23, 1973, approximately a year after the .initial application was made. The decision of the Commission established a fair value rate base, determined that 6.72% was a fair return on that base and authorized the Company to charge certain specified water rates, which in the Commission's opinion would yield a 6.72% rate of return. The actual rate schedule adopted was apparently prepared and furnished by the Commission's own staff, without consultation with the Company.

The Company filed an application for rehearing, contending that the 6.72% rate of return was unreasonable,[1] and that in any event the rate schedules adopted by the Commission would not yield this 6.72% return. Further, the Company requested that it be permitted to establish rates pending court review, subject to refund, which would enable it to earn the minimum rate of return testified to by an expert of 7.-7%. The Company's application for rehearing was denied and suit followed in superior court.

The hearing before the Commission established that as of July 31, 1972, (the end of the test year for the rate proceeding) substantially all of the Company's 10,150 customers were located in Sun City, a retirement community developed by Del E. Webb Corporation. The water distribution system (mains and services) are installed by Del E. Webb Corporation as contractor. The initial cost of this system is paid for by Del E. Webb Corporation, but the Company repays Del E. Webb Corporation in full for these facilities as customers are attached. This arrangement had the prior approval of the Commission. The Company itself pays for all wells, pumping plants, sewage facilities, buildings, equipment and related facilities. The Company's facilities as such are relatively new.

The evidence before the Commission and subsequently before the trial court on the issue of fair rate of return can be summarized as follows: (1) Dr. Walter A. Morton, an economist and rate of return expert called by the Company, testified that in his opinion a fair rate of return would be 9.-46%; (2) Jack O. Sanders, the Company's rate manager, testified that in his opinion a fair rate of return would be 9.-75%; and (3) Dr. John K. Langum, also a rate of return expert who testified for the Commission, was of the opinion that a "minimum" rate of return for the Company was "no less than 7.7%."

In essence, the Commission adopted the opinion of its own witness, Dr. Langum, but concluded: (1) Dr. Langum "did not

1. The Company did not either before the Commission or before the trial court object to the fair value rate base established by the Commission.

give enough recognition to the results of earnings of the eleven water utilities reported by" him;[2] (2) that the Company's properties were new and thus would have relatively low management and maintenance expense: (3) that because Sun City was one of the fastest growing areas in Arizona there are relatively few unused service connections, and (4) that the Company does not have to pay for its system until it becomes revenue producing and thus the risk is minimal to the owner compared to other utilities. Based upon these factors, the Commission set the rate of return at 6.72%.

At the time of trial before the superior court, Dr. Langum, while still maintaining his original opinion as to a rate of return of 7.7%,[3] was allowed to testify, over objection, that the methods used by the Commission in arriving at its conclusion were reasonable. At this time, the Company also produced evidence that the schedule of rates established by the Commission would in actuality yield a rate of return of only 6.07% instead of the 6.72% set by the Commission.

The issues presented on appeal are:

(1) What is the standard to be applied in judicial review of the Commission's decision?

(2) If the standard of review is the "substantial evidence test", is there substantial evidence which would justify the Commission's conclusion that 6.72% is a fair rate of return?

(3) Did the trial court err in finding that the schedule of rates established by the Commission would yield a 6.72% return?

(4) Was the trial court in error in the manner in which it remanded the matter back to the Commission?

We are first faced with the issue of the scope of judicial review of the decision of the Commission setting a fair rate of return. While both parties agree that the trial before the superior court is de novo, the Company has the burden of showing, pursuant to A.R.S. § 40–254(E), by "clear and satisfactory evidence", that the Commission's decision was unreasonable or unlawful, they differ as to the standard to be applied by the court in making this determination. The Commission, on the one hand, contends that it does not have to demonstrate either the evidence or the method it utilized in reaching its decision, with the limitation that the rate of return may not be confiscatory, but rather if a judicial review shows that the total effect of the rate of return is neither unjust nor unreasonable, judicial inquiry is at an end and the Commission must be affirmed. In support of this proposition, the Commission cites Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

The Company, on the other hand, points out that the Arizona Supreme Court has rejected the reasoning of the Hope case in rate base cases in Simms v. Round Valley Light & Power Co., 80 Ariz. 145, 294 P.2d 378 (1956). Because of this rejection of the "end result" reasoning of Hope in rate base cases, the Company urges that it should likewise be rejected in rate of return cases. The Company instead urges that the test for review of a rate of return decision of the Commission is that the decision must be supported by substantial evidence which is capable of being articulated to the reviewing court. Stated conversely, if there is no substantial evidence to support the Commission's decision, the Commission's action must be set aside and the matter remanded for further proceedings.[4]

2. The above quotation is from the Commission's decision.

3. The difference between Dr. Langum's opinion of 7.7% return and the 6.72% fixed by the Commission results in an estimated loss to the Company of approximately $130,000.00 per year.

4. Both parties agree that the court itself has no authority to set the rate of return and this function must be performed by the Commission.

It is clear that the *Simms* case rejected the reasoning of *Hope* based on Article 15, § 14 of the Arizona Constitution,[5] requiring that the Commission, in rate base cases, determine the fair value of the utility's property, stating:

"It is clear, therefore, that under our constitution as interpreted by this court, the commission is required to find the fair value of the company's property and use such finding as a rate base for the purpose of calculating what are just and reasonable rates. *The Hope case cannot be used by the commission. To do so would violate our constitution.* The statute under consideration in that case prescribed no formula for establishing a rate base. While our constitution does not establish a formula for arriving at fair value, it does require such value to be found and used as the base in fixing rates. *The reasonableness and justness of the rate must be related to this finding of fair value.* (emphasis added) 80 Ariz. at 151, 294 P.2d at 382.

The Commission argues that since the rejection of the rationale of the *Hope* decision was based upon constitutional considerations, and since there are no constitutional provisions dealing with rate of return as compared to rate base, *Simms* is not authority for rejecting *Hope* in rate of return determinations. We agree that the rate of return allowable to a public service corporation is not specifically mentioned in the constitution, but it is apparent that the sole constitutionally mandated purpose in determining the fair value of a utility's property is to enable the Commission to set a fair rate of return—the finding of fair base value having no purpose in and of itself. It is thus somewhat incongruous to say that the Commission cannot use an "end justifies the means" approach to determine the basis of the final determination, but can use that same approach in reaching the final determination itself.

As was stated in *Simms*, although admittedly dicta;

"The legislative duty and power to fix just and reasonable rates having been by the constitution delegated exclusively to the corporation commission, the courts cannot disturb the commission's ultimate conclusion or findings of facts in arriving at such conclusion when the same *is supported by substantial evidence,* is not arbitrary or is not otherwise unlawful." (emphasis added) 80 Ariz. at 154, 294 P.2d at 384.

Also *see, Florida Rate Conf. v. Florida Railroad & P. U. Com'n,* 108 So.2d 601 (Fla. 1959).

Even those cases cited by the Commission in support of the *Hope* rule have had some difficulty in applying the rule as is evidenced by this passage from *State Corp. Com'n v. Federal Power Com'n,* 206 F.2d 690 (8th Cir. 1953):

"However, the Congress has provided for judicial review of the orders of the Federal Power Commission in such cases. Obviously there must be some review. And as Mr. Justice Jackson stated in *Federal Power Commission v. Hope Natural Gas Company,* supra, 320 U.S. at page 645, 64 S.Ct. at page 308, 'If we are to hold that a given rate is reasonable just because the Commission has said it was reasonable, review becomes a costly, time-consuming pageant of no practical value to anyone.'" 206 F.2d at 722.

■ We therefore hold that the judicial scope of review of a decision of the Corporation Commission setting a fair rate of return for a public service corporation is to determine whether the Commission's order is supported by substantial evidence, and thus not arbitrary. See, *Ariz. Corp. Comm. v. Superior Court,* 107 Ariz. 24, 480 P.2d 988 (1971).

---

5. Art. 15, § 14, Arizona Constitution, provides in part: "The Corporation Commission shall, to aid it in the proper discharge of its duties, ascertain the fair value of the property within the State of every public service corporation doing business therein; . . . ."

In this regard, we specifically reject the rationale of the *Hope* decision, insofar as that case intimates that the Commission is allowed to reach its determination without fear of judicial scrutiny, as long as the end result is not unjust or unreasonable.

■ We turn then to a determination of whether the rate of return set by the Commission is supported by substantial evidence. It is first important to define what is "rate of return" and what is a "fair and reasonable" rate of return. "Rate of return" is the income earned by a utility after operating expenses, but before deduction of interest charges divided by the rate base. Thus, rate of return includes the interest which must be paid on short and long term debt and dividends on stock. *New England Tel. & Tel. Co. v. Dept. of Pub. Util.*, 331 Mass. 604, 121 N.E.2d 896 (1954). Simply put, rate of return is the net profit allowed the utility.

The U. S. Supreme Court has defined a fair rate of return in *Blue Field Water Works & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923):

"What annual rate will constitute just compensation [fair rate of return] depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties." 262 U.S. at 692–93, 43 S.Ct. at 679.

It is conceded by both the Company and the Commission that the fair rate of return concept embodied in the *Blue Field* decision requires the determination by the Commission of the "capital costs" of the business.

■ "Capital costs" as used in rate of return cases refers to the percentage figure it would cost the utility to obtain debt and equity capital. *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa.Super. 1, 140 A.2d 114 (1958). Debt cost as a part of a capital cost study is normally not a matter of dispute as it is provable as a historical fact. In this case, all the experts agree that the cost of the company's long-term debt was 6.00% and the short-term debt was 6.58%.

The cost of equity capital is not capable of such mathematical precision and in fact is a judgment call, enlightened by consideration of all the relevant factors. However, for the purposes of this preliminary discussion, cost of equity capital is normally determined by two methods—the "investor method", that is, an analysis of how investors form reasonable expectations of the earning-dividend and growth expectation of utility stocks or the "opportunity cost comparative earnings method", that is, what capital would earn in other enterprises of corresponding risks and hazards.

It is generally conceded by the parties in this case that the "opportunity cost-comparative earnings method" is the more reliable test for determining cost of equity capital and that the "investor's method" is primarily used as a check and guide to other measurements.

This then brings us to the crux of the problem before the court. While the Commission in its written decision states that it "must appraise the equity earning of other utilities, and non-regulated companies, and use this appraisal in setting the allowed

rate of return on the equity component in the cost of capital", its decision itself belies this comprehensive appraisal. The Commission rejected Dr. Morton's testimony primarily because he used Moody's Index of 125 Industrials in forming his opinion as to a proper rate of return. The Commission likewise rejected Mr. Sander's testimony because his opinion as to rate of return was higher than the seven water companies used in his report. Finally, Dr. Langum's opinion was modified because he did not give enough recognition to the earnings of the eleven water utilities reported by him. We therefore agree with the Company that the Commission's determination of the rate of return in this case was based solely upon a comparison of the rate of return on regulated water companies.

The Company contends that while it is proper to consider earnings of regulated utilities, to base a decision solely upon such a consideration is improper for three reasons: (1) There is a circularity of analysis if only earnings from regulated water companies are used, (2) the water company industry generally is in a distressed financial situation and therefore earnings from that industry are not reflective of a fair rate of return and (3) limiting consideration to water companies alone does not give adequate weight to the realities of the comparative money market and attraction of investments. In our opinion, the Company's contentions are well founded.

We agree with the statement in Garfield & Lovejoy, Public Utility Economics, at pg. 120, concerning the impropriety of looking only to earnings of other regulated utilities in reaching rate of return determination:

"First, there is a degree of circularity of analysis in looking to the earnings of other regulative utilities as an indication of what a fair return to a particular regulated utility might be. Second, the earnings of companies in the test group may have lagged adjustments to changed conditions, so that they either understate or overstate typical average earnings to such companies. Third, there is a question of whether utilities in the test group are regulated by the same methods as the utility in question."

The problem inherent in looking at utility A to fix utility B's rate of return and then looking at utility B to fix utility A's rate of return is "rather like observing an endless series of duplicate images in multiple mirrors, [and] would be hopelessly circular." *Re Union Electric Company*, 47 F.P.C. 144 (1972).

This problem is, in our opinion, compounded when only a specialized segment of the regulated utility industry is used as a comparison basis. In this case, the Commission, in our opinion, not only looked solely to regulated utilities in reaching a rate of return for the company, it limited its review to only a particular segment of that industry—water companies. While admittedly water companies are the *most* comparable utility to the Company, being itself a water company, the image reflected by that comparison is only that of other water companies and not what is a "fair rate of return". This is especially true, when evidence was presented that this industry was generally sick financially and that at least two of the companies used for comparison purposes had either merged with other companies or subsequently obtained rate of return increases. Companies which are used for comparison purposes must be successful and not in a financially sick condition. Nichols, Ruling Principles of Utility Regulation, Rate of Return (1955), at 310.

Finally, in order for the Commission to intelligently exercise its judgment in setting a rate of return, consideration must be given to the competitive money market for investments. As has been aptly pointed out by Professor Priest in his treatise, Principles of Public Utility Regulation, Volume I, a potential investor is under no restraint where he places his money, be that in corporate stocks, government bonds, debentures, or the capital gains

promised by high growth investments. Under such circumstances unless the investor is offered utility opportunities substantially comparable to other types of investments, the utility company will go begging for funds. We therefore hold that the Commission should give consideration to yields returned by these other types of investments when setting a rate of return for a utility. We do not mean to intimate that the utility is entitled to a rate of return comparable with a high risk, speculative stock. Rather, we are simply saying that the Commission in setting rates of return should properly consider the competitive investment market generally in order to avoid the possibility of placing the utility in an unfair investment situation.

■ Based upon the foregoing, we hold that the Commission improperly limited its decision in comparing only regulated water companies and because of this limitation, the Commission's decision is not based upon substantial evidence and must be set aside.

■ In setting aside this rate of return decision, we reiterate that the determination of a rate of return which includes a cost of equity factor, is not a precise science, and that reasonable men may differ as to its fair result. We do hold, however, that in reaching that result the Commission must consider all relevant factors and give the weight to them individually that in the opinion of the Commission they deserve. We are also cognizant that the Commission should not be bound solely by the opinions of experts which appear before it, be those company experts or staff experts. However, the right to reject opinions does not operate to create positive evidence or obviate the requirement that there be substantial evidence to support its conclusion. *City of Newport v. Newport Electric Division of Citizens Utilities Co.*, 116 Vt. 103, 70 A.2d 590 (1950).

■ Since this matter must be remanded to the Commission for further determinations, we will pass on the Company's contention that the Commission improperly considered the age of the Company's facility, the contractual relationship on extensions to its system with Del E. Webb Corporation, and the fact that the Company services a fast growing area. In our opinion, the Commission may properly consider these factors insofar as they relate to the question of risk to the potential investor. *See, Bluefield, supra*; *Wabash Valley Electric Co. v. Young,* 287 U.S. 488, 53 S. Ct. 234, 77 L.Ed. 447 (1933). We also note in passing that while we find no statutory procedures for the Company being allowed to participate in the fixing of rate schedules after a fair rate of return has been determined, such participation is, in our opinion, highly desirable to avoid future litigation and to enable the Commission to have placed before it all the competent data relative to that determination.

■ As previously indicated, the question of the Company's fair rate of return has been pending before the Commission and the courts since October, 1972. Because of this passage of time, we are of the opinion that under the authority of *Ariz. Corp. Com'n. v. Mountain States Tel. & Tel. Co.*, 71 Ariz. 404, 228 P.2d 749 (1951), Sun City Water Company should be entitled to fix a just and reasonable schedule of interim rates, pending action by the Commission. Therefore, the issuance of our mandate in this matter shall be authority to the Company to fix a just and reasonable schedule of rates for the use of its water pending the action of the Commission in establishing a fair rate of return and a schedule of rates which will provide the rate of return established. However, to adequately protect the water customers served by the Company from an unjust and unreasonable rate being fixed by the Company, the authority of the Company to fix such rates shall be conditioned upon the Company posting a bond with the Commission in an amount to be determined by the trial court. The conditions of the bond shall be that should the rates fixed by the Company exceed the rates finally established by the Commission to be just and

reasonable, then the Company shall refund to its customers the excess which it collected over and above the amount the Company would have collected had the rates finally determined by the Commission to be just and reasonable been in effect. If the rates finally determined by the Commission to be just and reasonable are equal to or more than the interim rates fixed by the Company then the bond shall be discharged.

Since we reverse the decision of the superior court and remand this matter to the Commission for further proceedings, for a proper determination of rate of return and rate schedules, we do not reach the other issues raised by the Company on appeal.

The judgment of the superior court is reversed and the matter remanded to the trial court for a determination of the amount of bond to be posted by the Company and upon that determination being made, the trial court is directed to remand the matter back to the Commission for further proceedings consistent with this opinion.

EUBANK and FROEB, JJ., concur.